UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

| | |
|---|---|
| LEONIN NABEDRIK, IRIS CERVANTES, CHAUDHRY ASHRAF, MICHAEL KELLEY, DONNA DELANEY, CHARLES JONES, CLAYTON FOUNTAIN, BERNADETTE CHAPMAN, DEANNA SCHWIND, LAKESHA BROWN, LEON BASTIAN, JUSTIN CHOINIERE, BENJAMIN PATTEN, MIMI FOGARTY, ALBERT TAYLOR, DAISY VERDEJO, KATHY HAVILAND, YANEZ MCGRIFF, ERIC BROWN, SR., MARY DREARRY, AUBREY GREENZWEIG, & DALE EVERETT TROUT, & JOHN ROES 1-100, | Civil Action No. **COMPLAINT** **JURY TRIAL DEMANDED** |

                              Plaintiffs,

              -against-

EMIGRANT MORTGAGE COMPANY, SETERUS, INC., BAYVIEW LOAN SERVICING, LLC, BRANCH BANKING & TRUST COMPANY, CARROLLTON BANK, EMBRACE HOME LOANS, INC., MCCUE MORTGAGE COMPANY, MIDWEST BANK, MORTGAGE INVESTORS CORPORATION, NORTH COAST CREDIT UNION, INC., REGIONS BANK D/B/A REGIONS MORTGAGE, RESIDENTIAL CREDIT SOLUTIONS, INC., ROUNDPOINT MORTGAGE SERVICING CORPORATION, SOVEREIGN BANK, N.A., SUNTRUST BANKS, INC., & VANDERBILT MORTGAGE AND FINANCE, INC,

                              Defendants.
-------------------------------------------------------------------X


## **INTRODUCTION**

      Plaintiffs Nabedrik, *et al*, bring this action against Defendants Bank of America, N.A., *et al*, for a variety of illegal actions pertaining to the creation and servicing of home mortgage loans.   Among the causes of action brought, Plaintiffs argue that they: (a) sought a loan

1

modification agreement through Defendants, its agents, and successors-in-interests as servicers of Plaintiffs' loans but their various requests and applications were rejected, without proper justification, (b) were subjected to predatory lending practices inducing Plaintiffs to accept unduly burdensome loans, including gross misrepresentations and various failures to disclose information, and (c) were charged monthly mortgage payments without a legal basis to benefit from those payments.  Plaintiffs allege upon information and belief common law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, fraudulent concealment, fraud for demanding and collecting monthly note payments under false pretense, unjust enrichment, and fraudulent inducement, and statutory violations under various state consumer protection statutes, the Federal Truth In Lending Act and the Real Estate Settlement Procedures Act.  Plaintiffs seek declaratory and injunctive relief, as well as damages, restitution and costs

### STATEMENT OF FACTS

**A) Defendants' Fraudulent Loan Modification Process**

1.      For a period ranging from months to several years prior to the commencement of this action, Plaintiffs' mortgages have been serviced by Defendants.  As a result of the severe economic downturn felt by so many in this country, Plaintiffs had fallen behind on their monthly mortgage payments and went into default.

2.      Due to the individual hardships felt by them, Plaintiffs inquired about mortgage assistance and requested loan modifications through Defendants, which were only allowed once Plaintiffs went into default.

3.      Defendants offered loan modifications to Plaintiffs and provided a modification application package to Plaintiffs pursuant to the terms of their offer.  This package required

Plaintiffs to provide allegedly necessary documentation to process the modifications as one of their obligations of the modification agreement.

4.      Defendants explained to Plaintiffs that following the submission and review of a completed modification package, Plaintiffs would be given terms to make payments as part of a trial modification.  If Plaintiffs' made the necessary monthly payments under the terms of the trial modification, a permanent modification would be granted.

5.      Plaintiffs accepted the loan modification offers and worked to meet the terms required of them, expecting Defendants to be bound to perform their obligation of granting a permanent modification.

6.      Plaintiffs either provided all of the requested documentation in support of their loan modification application to Defendants and met all the conditions precedent pursuant to a trial modification offer, or attempted to in good faith, but faced substantial interference from Defendant.

7.      In these latter instances, Plaintiffs could not possibly comply with their conditions precedent because Defendants put in place procedural safeguards to make the modification process as onerous and complicated as possible, even going so far as providing conflicting information to Plaintiffs regarding what was received or still needed.

8.      Even in instances where Plaintiffs provided everything required according to Defendants' initial document request, Defendants still sent missing documentation requests which often included documents previously sent by Plaintiffs.  Plaintiffs continued to provide the requested documents to Defendants despite having already submitted on multiple prior occasions.

9.     Upon information and belief, Defendants' missing document requests constituted a policy to interfere with and overly burden Plaintiffs from complying with modification terms or was a result of deficient protocols within Defendants' loan modification operations.

10.    One of Defendants' loss mitigation representatives would often give inconsistent information from another when handling Plaintiffs' inquiries.

11.    In cases where trial terms were not given, Defendants either gave no explanation or alleged that Plaintiffs did not provide the necessary documentation for processing or review. This was only been true because of the conflicting reports and inconsistent status updates given to Plaintiffs, or simply a failure of Defendants' loss mitigation representatives to adequately conduct document intake.

12.    When Plaintiffs were able to overcome Defendants' obstacles and meet the conditions of the modification agreement by providing sufficient documentation according to Defendants, they were given terms to make modification payments on a trial basis.  Plaintiffs made the required payments under the trial terms when it was offered.

13.    Following Plaintiffs' completion of the conditions precedent, they ultimately learned, often only after inquiring, that a permanent modification was not provided.  In some instances, Defendants provided no justification for their breach of contract.

14.    Other times, Defendants fabricated reasons for modification rejections.  One such excuse told to Plaintiffs was that certain documents necessary to support the loan modification were missing and/or had not been received by Defendants, despite the modification package being complete enough that trial terms were provided to Plaintiffs.

15.    Upon information and belief, when such improper justifications occurred, Defendants merely offered trial terms and encouraged Plaintiffs to make these payments in order

to strip as much remaining equity from them, knowing that Plaintiffs were pre-destined for a permanent modification rejection.

16.     If a permanent modification was granted, it included such disadvantageous terms that Defendants basically rendered Plaintiffs' performance impossible.

**B) Defendants' Conflicts of Interest**

17.     For a period ranging from months to several years prior to the commencement of this action, Plaintiffs' mortgages have been serviced by Defendants.  As a result of the severe economic downturn felt by so many in this country, Plaintiffs had fallen behind on their monthly mortgage payments and went into default.

18.     Upon information and belief, Defendants have insurance or other contractual relationships in which losses through foreclosure or short sale (i.e., when the homeowner-mortgagor loses his/her home) are paid in whole or in part to Defendants, in addition to the amount they realize on a foreclosure sale or short sale.  The loss is determined by the outstanding amount of the loan as distinguished from what Defendants may have paid for the loan.

19.     Upon information and belief, this insurance arrangement has been the motivation for Defendants to refuse to comply with the loan modification agreements entered into with qualified homeowners such as the Plaintiffs.  Defendants only receives reimbursements for its "losses" if the mortgaged property is sold through foreclosure sale or short sale, and not if the loan is modified.

20.     The Plaintiffs have a financial hardship resulting from the deteriorating economy, the decline in market and rental value of real estate generally and the Plaintiffs' real property specifically, as well as a related reduction in income.  Starting months ago, the Plaintiffs have been unable to service their existing notes, which are backed by the mortgage securities held by

Defendants, based on the outstanding principal amount of their notes.  Defendants have been aware of this at all relevant times through information provided by the Plaintiffs to Defendants or its agents and successors-in-interest.

21.     The Plaintiffs have the capacity to make monthly payments based on a note if it were restructured with a principal amount equal to the present value of the property and a lower interest rate (equal to the present market rate of interest).  As such, Plaintiffs should have an option to do so, which would give Defendants an amount in value equal to or greater than the amount it can lawfully realize through the sale of the property securing the note.

22.     The Plaintiffs have the financial capacity to service such a restructured note.

23.     The Plaintiffs are willing and able to pay to Defendants and/or any successors in interest the full amount which it/they are lawfully able to obtain through sale of the property securing their current notes.  Defendants' failure to provide a right of first refusal or offer for the Plaintiffs to retain ownership of their property under these terms is a predatory lending practice and a breach of the implied covenant of good faith and fair dealing and industry custom and usage to negotiate workout agreements in good faith with financially troubled borrowers.

24.     Such predatory lending consists of Defendants' failure to offer the Plaintiffs an opportunity to remain in their mortgaged properties through a loan modification agreement based on the present value of the property and the present market rate of interest.  Modification terms should be such that Plaintiffs could afford them and commensurate with what Defendants would obtain through foreclosure sales of the individual Plaintiffs' properties.

25.     Defendants has created various conflicts of interest as part of its loss-sharing agreements, giving it no incentive to negotiate with the Plaintiffs in good faith including:

6

A. Defendants' desire to have the Plaintiffs' homes sold through either foreclosure auction or short sale, which would enable Defendants to obtain payment on a type of insurance-like contract through a credit default swap or other derivative, which pays the Defendants a substantial percentage of any loss suffered by the Defendants, but only if the mortgaged property is sold. These credit default swaps and insurance-like practices occurred with little to no transparency.  They are predatory and justification for terminating any interest that Defendants may have in the Plaintiffs' notes;

B. To evade the requirement under any contract that Defendants have with the Plaintiffs to deal with them fairly and in good faith;

C. To evade the custom and usage in the banking industry to negotiate in good faith for a workout agreement (or loan modification agreement) with the Plaintiffs under a financially-troubled loan;

D. To turn Defendants' inventory of loans into loans which are more likely to default and go into foreclosure and sale or short sale, to obtain payment of the illegal insurance taken out against the interests of the Plaintiffs and other homeowner/mortgagors.

E. To make this loan, even if it is not securitized, into a loan with some of the consequences of a securitized loan, including the recovery of illegal insurance on losses established only through sale of the mortgaged property, instead of trying to save the Plaintiffs from losing their homes.

26.    The insurance arrangements (involving credit default swaps) described above were not registered as insurance in any state, and were illegal for a variety of reasons including

the lack of an insurance interest as to at least part of the insurance. In effect, Defendants were incentivized to force the Plaintiffs towards foreclosure or short sale to collect an additional, secret amount from the credit default swaps or similar derivatives.

27.    Unbeknownst to the Plaintiffs, they were denied the opportunity to deal with a party who could conduct good faith negotiations with respect to a workout or loan modification agreement with Defendants, in breach of industry custom and usage.

28.    Upon information and belief, Defendants have had, and continues to have, a fraudulent loan modification program, by pretending to offer the possibility of a loan modification agreement to the Plaintiffs and other homeowners. Defendants are simultaneously requiring the Plaintiffs to go into default to enable Defendants to pursue foreclosure or threaten to foreclose against the same homeowners.

29.    This is part of a false and misleading "dual-track" process used by Defendants to lure mortgagor homeowners into defaulting on their mortgages and any foreclosure actions. Defendants require homeowners to go into default, to supposedly work with them for loan relief. Defendants then deny applications for loan modification and sells the mortgaged property without judicial proceedings in most states, or after drawing homeowners into defaulting in foreclosure actions against them in the other states.

30.    In this way, Defendants acquires a mortgaged residential property at a distress price substantially lower than the actual market value for the mortgaged property, to cash in on the secret, illegal insurance arrangements. This encourages Defendants to remove Plaintiffs from their homes through sale of the property rather than by giving homeowners a needed and deserved loan modification agreement to keep them in their property.

31.     Upon information and belief, the dual-track process that Defendants have pursued, continues to pursue, or would pursue, in its business dealings with the Plaintiffs is not, and is not intended as, a good faith attempt to offer and negotiate a loan modification agreement. Instead, it is a ruse used by Defendants to make the Plaintiffs and others similarly situated believe that there is a fair opportunity for them to obtain a reasonable loan modification agreement when in fact there is no such opportunity.

32.     Upon information and belief, the activities of Defendants are comparable to the activities of the bank and servicer described in a court decision, *Indymac Bank F.S.B. v. Yano-Horoski*, 2009 NY Slip Op 52333(U) (Sup. Ct., Suff. Co., 11/19/09, Justice Spinner), where the bank demonstrated "…no good faith intention whatsoever of resolving this matter in any manner other than a complete and forcible devolution of title from [the homeowner]."

33.      Defendants had no intention of complying with the loan modification agreements and instead looked to create a default, to result in the sale of Plaintiffs' properties, for the reasons set forth above.

34.     Upon information and belief, Defendants have breached their agreements by failing to modify Plaintiffs' loans after Plaintiffs met all conditions precedent to Defendants' offer.

35.     Upon information and belief, Defendants have and apply no standards for determining who will be granted Home Affordable Modification Program (hereinafter "HAMP") loan modifications (pursuant to the Helping Families Save Their Homes Act of 2009) by Defendants, and this applies as well to their in-house loan modification programs.

36.     Upon information and belief, Defendants have and apply no standards for the awarding of payouts to homeowners pursuant to the subsequent settlements with the Federal

government in which modification-related wrongdoing were found following the establishment of HAMP.

37.     The dual-track process is designed to create the appearance that Defendants were working toward a resolution of the financial problems of Plaintiffs and other homeowners through a loan modification agreement.   However, behind the scenes, Defendants were aggressively pursuing or planning to pursue foreclosure and sale.

38.     Defendants led the Plaintiffs and others similarly situated to believe that there was hope for a loan modification agreement and no threat of foreclosure.   But this is not true. Defendants lulled the Plaintiffs and others into a false sense of security (and deterred them from seeking alternative refinancing for an extended period in which to sell their property at the highest price) by misrepresenting that there was hope for a reasonable modification agreement when in fact there was no hope.

39.     Defendants had no intention of granting any loan modification agreement that would possibly assist Plaintiffs in a meaningful matter in the vast majority of cases where applicants were qualified, and planned to use the default to sell the Plaintiffs' property instead of permitting the Plaintiffs to remain in their property through a reasonable loan modification agreement.

40.     This dual-track process is part of Defendants' national business policy for dealing with foreclosure actions in the judicial foreclosure states, and is the subject of various foreclosure-fraud lawsuits in other states.

**C) Defendants' Predatory Lending Behavior and Loan Review Process**

41.     A major aspect of Defendants' deceptive and predatory lending practices occurred during the creation of Plaintiffs' loans.   Defendants had a mendacious practice of offering loans

10

with terms that would never have been accepted by Plaintiffs based on their financial means, had it not been for Defendants' misrepresentations of material terms.

42.    To further induce Plaintiffs to accept certain loans pushed upon them, Defendants made false assurances to Plaintiffs that housing prices would continue to rise and general misrepresentations as to the stability of the housing market.   Despite these statements, Defendants were already preparing for a crash, though its dual-track process; a crash Defendants played a large part in due to their predatory lending practices.

43.    At the time of Plaintiffs' loans inception, their actual financial documents were insufficiently relied upon as part of their loan applications from Defendants.   Defendants consistently preyed upon Plaintiffs by providing unsuitable loans based upon the Plaintiffs' current income at the time, as well as future, expected income.

44.    Upon information and belief, Plaintiffs' applications served as after-the-fact justification for Defendants making the loans once they had each already been individually approved.

45.    When Plaintiffs applied for their loans, Defendants often did not require them to provide sufficient documentation, such as pay stubs, bank statements, or tax returns, to show what the income was.   Instead, Defendants just accepted on the day of the closing, the loan applications without offering the proper due diligence required to determine whether Plaintiffs were qualified to receive each of their individual loans.

46.    Defendants were lending based on terms not commensurate to Plaintiffs' actual income.   It was a tolerated practice by Defendants to exaggerate incomes of certain Plaintiffs because Defendants' underwriting guidelines allowed it to lend more money.   This let

Defendants to garner more interest and generate more fees than would otherwise have been possible.

47. Defendants also allowed loan applications to be based on artificially inflated appraisal for the homes. This occurred due to an absence of strict underwriting protocols, and helped artificially drive up the market which Defendants profited from.

48. As part of this cursory loan application review process, Defendants either negligently or willfully approved Plaintiffs for loans when it should have been apparent that default was a likely outcome.

49. Defendants offered and encouraged certain loans to Plaintiffs, while simultaneously assuring that Plaintiffs at any time could easily sell their homes or refinance for more favorable terms, if they ever did find themselves in a position where the loan became too difficult to maintain. In doing this, Defendants were knowingly misrepresenting that the housing market would continue to grow at a similar rate, while simultaneously hedging against that fact.

50. Defendants had sufficient information based on its own contributions to the artificially created growth in the real estate market that the housing market was due for a severe crash.

51. However, as Plaintiffs became embattled with these oppressive obligations on homes with values that dropped sharply after the country-wide depression, Defendants benefitted through their concealed dual-track system.

**D) Defendants' Failure to Disclose**

52. Of the type of loans offered by Defendants, there existed fixed-rate loans, and adjustable-rate pay option loans, which could contain a negative amortization feature. Despite

the varying nature of the offered loans, the individual implications of each type of loan were not adequately conveyed to the Plaintiffs, especially their long-term ramifications.

53.     Defendants deceitfully valued a loan's profitability over Plaintiffs' ability to avoid foreclosure.

54.     These types of adjustable rate loans are particularly profitable for Defendants, and upon information and belief, Defendants used incentives to motivate its internal personnel to market these loans.   Through increased compensation, loan officers were encouraged to sell adjustable rate mortgage with higher margins or above-par rate, which ultimately put borrowers into higher cost loans.

55.     Regarding the adjustable rate loans, Defendants stressed the low required payments in the loan's early years, and hid the inevitable payment shock felt by the borrower when the payments increased.   This was done despite Defendants knowing that Plaintiffs' income would not increase in a similar fashion.

56.     Defendants also marginalized hpw the negative amortization feature could make the loan difficult to refinance or that there were significant prepayment penalties.

57.     Such negatively amortized loans allowed Plaintiffs to pay less than the full accrued interest during the loan's early years, and unpaid interest is added to the loan principal so that the principal increases, instead of it decreasing as normally occurs with a mortgage loan.

58.     Ultimately, these types of loans quickly become more and more expensive for the borrower, until they could not be afforded, yet Plaintiffs entered into these agreements because the implications were not adequately disclosed to them by Defendants.

59.     Upon information and belief, Plaintiffs were steered into loans not suitable for themselves because of their individual financial situations.  Defendants should have advised against these mortgages if the loan applications were reviewed with proper diligence and care.

60.     Instead, Defendants relied on misrepresentations and deceitful practices while maintaining an illegal incentive program that provided higher commissions to loan officers who pushed these loans.

61.     The omission of important information in Defendants' sales pitches put Plaintiffs in a far worse position had they not taken a loan from Defendants.  Plaintiffs became saddled with onerous terms that quickly became unaffordable for them either from undisclosed payment information like escrow amounts or from variable payment terms.

62.     Defendants were very clearly engaged in a scheme designed to maneuver Plaintiffs into a loan that they ultimately were not qualified for simply with the goal of obtaining greater profits through adjustable rates, negative amortizations, or higher rates than could be afforded, because they all allowed for greater interest amounts to Defendants.

63.     Upon learning of various predatory practices and potentially illegal abuses, Plaintiffs submitted Qualified Written Requests (hereinafter "QWR") under the Real Estate Settlement Procedures Act ("RESPA"), 12 USC § 2605(e).

64.     In these QWRs, Plaintiffs formally disputed the validity of their current debts with Defendants and requested all available information pertaining to their loans to determine what misrepresentations and failures to disclose occurred, as well as whether the loan origination, accounting of payments and fees, and ownership details had been proper.

65.     To date, and far beyond the sixty days required under Section 6 of RESPA, Defendants have failed to provide any of the documentation requested in the QWRs or attempt in

any way to resolve the issues Plaintiffs complained.  Defendants also have not provided an adequate reason for its refusal to do so.

## JURISDICTION AND VENUE

66.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

67.     This Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged herein took place in New York.  Defendants are authorized to do business in New York and have sufficient minimum contacts with New York through the promotion, marketing and servicing of loans in New York so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

68.     Venue is proper in this District under 28 U.S.C. § 1391(a)-(c), because Defendants transacts business, maintains offices, and is otherwise found within this District; and the Defendants' unlawful acts giving rise to some of Plaintiffs' claims occurred, and a substantial portion of the affected trade and commerce described herein, have been carried out in this District.

## THE PARTIES

69.     Plaintiff Leonin Nabedrik is an individual and a resident of the State of New York.  Plaintiff Nabedrik owns the premises known as and located at 2262 Hendrickson Street, Brooklyn, New York 11234.  Plaintiff Nabedrik executed a promissory note to Emigrant Mortgage Company, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Emigrant Mortgage Company.

15

70.     Plaintiff Iris Cervantes is an individual and a resident of the State of New York. Plaintiff Cervantes owns the premises known as and located at 2 Pine Hill Court, Northport, New York 11768.  Plaintiff Cervantes executed a promissory note to Emigrant Mortgage Company, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Emigrant Mortgage Company.

71.     Plaintiff Chaudhry Ashraf is an individual and a resident of the State of New York.  Plaintiff Ashraf owns the premises known as and located at 2879 Route 209, Kingston, New York 12401.  Plaintiff Ashraf executed a promissory note to Seterus, Inc, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Seterus, Inc.

72.     Plaintiff Michael Kelley is an individual and a resident of the State of Maryland. Plaintiff Kelley owns the premises known as and located at 307 Schooner Lane, Berlin, Maryland 21811.  Plaintiff Kelley executed a promissory note to Seterus, Inc, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Seterus, Inc.

73.     Plaintiff Donna Delaney is an individual and a resident of the State of Pennsylvania.  Plaintiff Delaney owns the premises known as and located at 1190 Camac Avenue, Bensalem, Pennsylvania 19020.  Plaintiff Delaney executed a promissory note to Seterus, Inc, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Seterus, Inc.

74.     Plaintiff Charles Jones is an individual and a resident of the State of Wisconsin. Plaintiff Jones owns the premises known as and located at 2861 Rimrock Road, Fitchburg, Wisconsin 53713.  Plaintiff Jones executed a promissory note to Seterus, Inc, which is secured

by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Seterus, Inc.

75.     Plaintiff Clayton Fountain is an individual and a resident of the State of New York.  Plaintiff Fountain owns the premises known as and located at 799 State Route 86, Gabriels, New York 12393.  Plaintiff Fountain executed a promissory note to Bayview Loan Servicing, LLC, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Bayview Loan Servicing, LLC.

76.     Plaintiff Bernadette Chapman is an individual and a resident of the State of Washington.  Plaintiff Chapman owns the premises known as and located at 27010 Florence Road, Stanwood, Washington 98292.  Plaintiff Chapman executed a promissory note to Bayview Loan Servicing, LLC, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Bayview Loan Servicing, LLC.

77.     Plaintiff Deanna Schwind is an individual and a resident of the State of South Carolina.  Plaintiff Schwind owns the premises known as and located at 985 Bonita Loop, Myrtle Beach, South Carolina 29588.  Plaintiff Fountain executed a promissory note to Branch Banking & Trust Company, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Branch Banking & Trust Company.

78.     Plaintiff Lakesha Brown is an individual and a resident of the State of Maryland. Plaintiff Brown owns the premises known as and located at 5514 Cadillac Avenue, Gwynn Oak, Maryland, 21207.  Plaintiff Brown executed a promissory note to Carrollton Bank, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Carrollton Bank.

79.     Plaintiff Leon Bastian is an individual and a resident of the State of South Carolina.  Plaintiff Bastian owns the premises known as and located at 236 Overhill Drive, Walterboro, South Carolina 29488.  Plaintiff Bastian executed a promissory note to Embrace Home Loans Inc., which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Embrace Home Loans, Inc.

80.     Plaintiff Justin Choiniere is an individual and a resident of the State of Connecticut.  Plaintiff Choiniere owns the premises known as and located at 24 Wagon Road, Enfield, Connecticut 06082.  Plaintiff Choiniere executed a promissory note to McCue Mortgage Company, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant McCue Mortgage Company.

81.     Plaintiff Benjamin Patten is an individual and a resident of the State of Minnesota. Plaintiff Patten owns the premises known as and located at 25964 175th Avenue, Fergus Falls, Minnesota 56537.  Plaintiff Patten executed a promissory note to Midwest Bank, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Midwest Bank.

82.     Plaintiff Mimi Fogarty is an individual and a resident of the State of Wisconsin. Plaintiff Mimi Fogarty owns the premises known as and located at 1521 Commanche Avenue, Green Bay, Wisconsin 54313.  Plaintiff Fountain executed a promissory note to Mortgage Investors Corporation, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Mortgage Investors Corporation.

83.     Plaintiff Albert Taylor is an individual and a resident of the State of Washington. Plaintiff Taylor owns the premises known as and located at 25248 Old Day Creek Road, Sedro Woolley, Washington 98284.  Plaintiff Taylor executed a promissory note to North Coast Credit

Union, Inc., which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant North Coast Credit Union, Inc.

84.     Plaintiff Daisy Verdejo is an individual and a resident of the State of Illinois. Plaintiff Verdejo owns the premises known as and located at 1477 West 72nd Place, Chicago, Illinois 60636.  Plaintiff Verdejo executed a promissory note to Regions Bank, d/b/a Regions Mortgage, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Regions Bank, d/b/a Regions Mortgage.

85.     Plaintiff Kathy Haviland is an individual and a resident of the State of Maryland. Plaintiff Haviland owns the premises known as and located at 401 Shannon Court, Frederick, Maryland 21701.  Plaintiff Haviland executed a promissory note to Residential Credit Solutions, Inc., which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Residential Credit Solutions, Inc.

86.     Plaintiff Yanez McGriff is an individual and a resident of the State of New York. Plaintiff McGriff owns the premises known as and located at 241-26 143rd Avenue, Rosedale, New York 11422.  Plaintiff McGriff executed a promissory note to RoundPoint Mortgage Servicing Corporation, which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant RoundPoint Mortgage Servicing Corporation.

87.     Plaintiff Eric Brown, Sr. is an individual and a resident of the State of Pennsylvania.  Plaintiff Brown owns the premises known as and located at 5775 Lincoln Highway, Gap, Pennsylvania, 17527.  Plaintiff Brown executed a promissory note to Sovereign Bank, N.A., which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Sovereign Bank, N.A.

88.     Plaintiff Mary Drearry is an individual and a resident of the State of Pennsylvania. Plaintiff Drearry owns the premises known as and located at 7910 Michener Avenue, Philadelphia, Pennsylvania, 19150.  Plaintiff Drearry executed a promissory note to Sovereign Bank, N.A., which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Sovereign Bank, N.A.

89.     Plaintiff Aubrey Greenzweig is an individual and a resident of the State of Pennsylvania.  Plaintiff Greenzweig owns the premises known as and located at 1147 3rd Street, Catasauqua, Pennsylvania, 18032.  Plaintiff Greenzweig executed a promissory note to Suntrust Banks, Inc., which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Suntrust Banks, Inc.

90.     Plaintiff Dale Everett Trout is an individual and a resident of the State of Arkansas.  Plaintiff Trout owns the premises known as and located at 336 Highway 25, Saffell, Arkansas 72572.   Plaintiff Trout executed a promissory note to Vanderbilt Mortgage and Finance, Inc., which is secured by a mortgage against this premises.  Said mortgage is currently serviced by Defendant Vanderbilt Mortgage and Finance, Inc.

91.     Plaintiffs' counsel is aware of and has provided services to unnamed ROE Plaintiffs, each of whom sustained actual injury.  The unnamed ROES sue under their names fictitiously because they either wish to maintain their privacy or because Plaintiffs' counsel have not completed the due diligence necessary to properly plead their claims as of the filing of this Complaint.  From time-to-time, upon conducting the due diligence and learning the information sufficient to add remaining ROE Plaintiffs to this action, Plaintiffs shall seek leave of Court to amend this Complaint to name these additional ROE Plaintiffs, or will follow such other process as is proscribed by the Court.

92.     An additional large number of persons have contacted Counsel or their staffs pertaining to the matters complained of herein.  In the event Plaintiffs believe it is in furtherance of judicial economy and justice to add all or any of these additional persons to this Complaint, Plaintiffs shall bring a noticed motion to add such parties to this action.

93.     In the event Plaintiffs file a separate lawsuit appertaining to all or any of these unnamed persons, or such further number as may exist in view of future developments, Plaintiffs shall file all appropriate Notices of Related Cases, or as otherwise directed by the Court.

94.     Defendant Emigrant Mortgage Company is a domestic company organized under the laws of New York.  Defendant Emigrant Mortgage Company is located at 5 East 42nd Street, New York, New York 10017.

95.     Defendant Seterus, Inc. is a domestic corporation incorporated under the laws of North Carolina.  Defendant Seterus, Inc. is located at 8501 IBM Drive, Building 201, Charlotte, North Carolina 28262.

96.     Defendant Bayview Loan Servicing, LLC is a domestic limited liability company organized under the laws of Florida.  Defendant Bayview Loan Servicing, LLC is located at 4425 Ponce De Leon Boulevard, Suite 500, Miami, FL 33146.

97.     Defendant Branch Banking & Trust Company is a domestic company organized under the laws of North Carolina.  Defendant Branch & Trust Company is located at 200 West Second Street, Winston Salem, North Carolina 27101.

98.     Defendant Carrollton Bank is a domestic banking company organized under the laws of Illinois.  Defendant Carrollton Bank is located at 315 Sixth Street, Carrollton, Illinois 62016.

99.     Defendant Embrace Home Loans, Inc. is a domestic corporation organized under the laws of Rhode Island.  Defendant Embrace Home Loans, Inc. is located at 25 Enterprise Center, #200, Middletown, Rhode Island 02842.

100.    Defendant McCue Mortgage Company is a domestic company organized under the laws of Connecticut.  Defendant McCue Mortgage Company is located at 1 Liberty Square #3, New Britain, Connecticut 06051.

101.    Defendant Midwest Bank is a domestic banking company organized under the laws of Minnesota.  Defendant Midwest Bank is located at 215 Front Street South, Barnesville, Minnesota 56514.

102.    Defendant Mortgage Investors Corporation is a domestic corporation incorporated under the laws of Florida.  Defendant Mortgage Investors Corporation is located at 6090 Central Avenue, Saint Petersburg, Florida 33707.

103.    Defendant North Coast Credit Union, Inc. is a domestic corporation incorporated under the laws of Washington.  Defendant North Coast Credit Union, Inc. is located at 1100 Dupont Street, Bellingham, Washington 98225.

104.    Defendant Regions Bank is a domestic banking company organized under the laws of Alabama.  Defendant Regions Bank is located at 1900 Fifth Avenue North, Birmingham, Alabama 35203.

105.    Defendant Residential Credit Solutions, Inc. is a domestic corporation incorporated under the laws of Texas.  Defendant Residential Credit Solutions, Inc. is located at 3001 Meacham Boulevard, Suite 125, Forth Worth, Texas 76137.

106.    Defendant Roundpoint Mortgage Servicing Corporation is a domestic corporation incoporated under the laws of North Carolina.  Defendant Roundpoint Mortgage Servicing

Corporation is located at 5032 Parkway Plaza Boulevard, Suite 200, Charlotte, North Carolina 28217.

107.   Defendant Sovereign Bank, N.A. is a domestic national banking association organized under the laws of the United States.  Defendant Sovereign Bank, N.A. is located at 75 State Street, Boston, Massachusetts 02109.

108.   Defendant Suntrust Banks, Inc. is a domestic corporation incorporated under the laws of Georgia.  Defendant Suntrust Banks, Inc. is located at 303 Peachtree Street NE, Atlanta, Georgia 30308.

109.   Defendant Vanderbilt Mortgage and Finance, Inc. is a domestic corporation incorporated under the laws of Tennessee.  Defendant Vanderbilt Mortgage and Finance, Inc. is located at 500 Alcoa Trail, Maryville, Tennessee 37804.

## COUNT I

### Breach of Contract

110.   The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

111.   Plaintiffs held individual mortgages that were serviced by Defendants, and after suffering financial problems and the eventual default of the terms of Plaintiffs' promissory notes, Plaintiffs requested loan modifications from Defendants.

112.   Defendants offered each of the Plaintiffs a modification pursuant to the completion of terms under a trial modification.  Plaintiffs each and every one of them, accepted the modification offer.

113.     Plaintiffs either met the conditions precedent by complying with all terms of the trial, beginning with providing all documentation as part of the modification application package or were unable to because of Defendants' substantial interference.

114.     Defendants would often send multiple requests that Plaintiffs submit additional documents to Defendants, claiming documents were missing or not submitted, after Plaintiffs already provided the documents in question.  Defendants even provided conflicting information to individual Plaintiffs regarding what was allegedly received.

115.     These repetitive, unduly complicated, and burdensome requests occurred to interfere with Plaintiffs' loan modification application.   Plaintiffs again complied with Defendants' requests or attempted as best as possible in spite of Defendant's efforts to impede Plaintiff's compliance with their requirements under the modification agreement.

116.     Defendants often would not provide trial modification terms to Plaintiffs, for their alleged shortcomings in the modification process, which could only be explained by either the inconsistent and conflicting status updates given to Plaintiffs that Defendants used to their benefit, or a failure of Defendants' loss mitigation representatives to adequately conduct document intake.

117.     When Plaintiffs were able to satisfy certain conditions according to Defendants, Plaintiffs were given trial modification payment terms.  Defendants also indicated that the furnishing of the necessary trial payments constituted an additional condition precedent pursuant to the modification agreement, which if met would provide for a permanent modification.

118.     Plaintiffs made the monthly trial payments pursuant to the loan modification agreement offered by Defendants.

119.   Following Plaintiff's completion of all conditions precedent, Defendants refused to comply with the loan modification agreement and give a permanent modification as contracted upon.

120.   Defendants had an obligation to modify Plaintiffs' loans but breached the terms of their loan modification agreement with Plaintiffs and other similarly situated homeowners. Defendants systematically deprived Plaintiffs and other homeowners the benefits of the loan modifications while benefiting from their insurance-like contracts.  These removed the incentive to work with Plaintiffs to obtain modifications by, *inter alia*, giving repeating and onerous documentation demands, delaying processing of documentation of documents, failing to allocate sufficient resources and to train competent and knowledgeable staff in order to ensure accurate and timely processing of loan modifications, and other failures described herein.

121.   Upon information and belief, Defendants often make their repetitive requests claiming Plaintiffs did not submit certain documents as part of the modification package to fraudulently create justification for not giving the Plaintiffs their permanent modification.

122.   Defendants have denied or failed to provide Plaintiffs a loan modification and instead, has generated profit for itself by continuing to charge excessive late and default fees and interest.

123.   As a direct and proximate result of Defendants' breach of their loan modification agreements, Plaintiffs did not receive the benefit of the bargain, suffered damages and are threatened with additional harm, in an amount to be determined at trial.

## COUNT II

## Breach of the Implied Covenant of Good Faith and Fair Dealing

124.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

125.    Every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract, which requires that neither party do anything to infringe on the other party's rights to the benefits of the agreements or to deprive the other party of the benefits of the contract.

126.    Defendants breached the implied covenant of good faith and fair dealing contained in their loan modification agreements.

127.    Defendants further breached the implied covenant of good faith and fair dealing by, *inter alia*,

    A.  failing to make a good faith effort to fulfill Defendants' contractual obligations, written and implied promises, and loan servicing functions;

    B.  demanding the same documents be sent on multiple occasions, delaying processing of documents, and failing to allocate sufficient resources and to train competent and knowledgeable staff in order to ensure accurate and timely processing of loan modification requests; and

    C.  demanding late fees, interest and other delinquency related fees from Plaintiff in excess of what they could reasonably pay.

128.    As a direct result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs suffered damages in an amount to be determined at trial.

## COUNT III

## **Promissory Estoppel**

129.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

130.    Defendants represented that Plaintiffs were approved for loan modifications, and that Plaintiffs could make modified, reduced payments that would satisfy existing loan obligations for the terms set forth in the loan modification agreements.

131.    Defendants intentionally induced Plaintiffs to rely on its representations concerning its loan modification programs and to begin making the modified payments

132.    Plaintiffs' reliance was reasonable in light of Defendants' representations regarding its loan modification program.

133.    Plaintiffs and other similarly situated homeowners relied on the representations of Defendants to their detriment.

**COUNT IV**

**Fraudulent Concealment**

134.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

135.    Defendants used fraud and artifice to lure Plaintiffs into defaulting on their mortgages by promising future opportunities for loan modifications when they had no intention of providing such permanent modifications.

136.    Once Defendants guided Plaintiffs into default, Defendants were able to collect upon their credit default swaps, which allow Defendants to collect on every loan that goes bad by entering into default.

137.    As a result of these practices, Defendants failed to provide permanent modifications for the entitled Plaintiffs and encouraged default on their loans.  By hedging

against each of the Plaintiffs by conducting credit default swaps on every loan serviced, Defendants were able to collect on these side bets.

138.   Defendants' ulterior motives to see Plaintiffs remain in default on their mortgages rather than offer a modification, after conveying to Plaintiffs that one would be given, had been hidden from the Plaintiffs by Defendants.

139.   These suppressed facts and circumstances described herein should have been disclosed to the Plaintiffs by the Defendants.  Such details were material because they were essential to Plaintiff's analysis that would have been undertaken in determining whether to enter into a loan transaction with the Defendants.  Had Plaintiff known this information, Plaintiffs would have acted differently than without having this vital information concealed by Defendants.

140.   These concealed facts and circumstances were known to Defendants at the time they were hidden from Plaintiffs.

141.   Defendants were aware at the time of the suppression of information that this concealment would induce Plaintiffs to act in a way that was injurious, while at the same time being profitable and advantageous to Defendants.

142.   By concealing this information, Defendants intended to induce Plaintiffs to alter their positions to their harm.

143.   Plaintiffs justifiably and reasonably relied on the fraudulent concealment created by Defendants' suppression of information.

144.   Defendants' gain of profits from the credit default swaps combined with their receipt of money from Plaintiffs in the form of trial modification payments represents a windfall gained by the Defendants.

28

145.    Defendants knowingly and willingly committed this wrongdoing against the Plaintiffs as described herein and knowingly chose to deceive them.  These acts were malicious, and performed with a wanton disregard for Plaintiffs' legal rights.  Plaintiffs are therefore entitled to punitive damages.

## COUNT V

### Fraud for Demanding and Collecting Monthly Note Payments under False Pretenses

146.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

147.    Upon information and belief, starting as early as the formation and securitization of the notes, and up to and including the last date of payments by the Plaintiffs, Defendants and its agents, servicers, predecessors, and successors-in-interest made false representations of material fact by demanding, and thereafter collecting payments on the notes from the Plaintiffs.

148.    This is an action against Defendants, including the successors-in-interest to Plaintiffs' original lenders, as to whether they are the owner and in possession of promissory notes executed by the Defendants, where notes were assigned by its payee, directly or indirectly, to one or more underwriters and Real Estate Mortgage Investment Conduit (REMIC) trustees and servicers for securitization.  A REMIC is an entity that holds a fixed pool of mortgages and issues multiple classes of interests in itself to investors, which allows for the issuance of mortgage-backed securities pursuant to 26 USC § 860D.

149.    Due to this securitization process, including the possibility of unrelated assignments of, borrowing against, and pledging of the notes by Wall Street financial institutions, it is not clear to the Plaintiffs who are the owners of their notes.

150.    Various purported assignments of Plaintiffs' notes allegedly occurred among Defendants and others in the securitization of the loan, including an assignment of the notes from its original payee to one or more depositors (i.e., note bundlers for resale), underwriters, syndicate managers, and then to a REMIC trustee, and possibly one or more loan servicers, special servicers or master servicers.

151.    Also, upon information and belief, the notes were assigned to one or more financial institutions, lenders or others as security or payment in one or more transactions that had nothing to do with the Plaintiffs.

152.    Upon information and belief, each of the note assignments was governed by an underwriting agreement and a pooling and servicing agreement which is governed by and to be construed under New York law, and Internal Revenue Code rules relating to REMIC rules (prohibiting assignments of notes to or from the trust except under limited circumstances and date ranges).

153.    The documentary evidence and witnesses needed by the Plaintiffs to determine the ownership of their individual notes are maintained by Defendants, including the underwriting agreement, the pooling and servicing agreement, the various transactions pursuant to which the notes was securitized, all transactions involving the notes with the REMIC trustee, any of the servicers; and witnesses to the various stages of securitization and assignments of the notes by the underwriters, REMIC trustee, and servicers.

154.    Each time Defendants or its agent, servicer, predecessor, or successor-in-interest sent its monthly statement to the Plaintiffs, it has represented, impliedly or literally, that it has the right to demand and collect such monthly payments on their notes.

155. Upon information and belief, each such representation was a false representation of material fact.

156. These representations of material fact were made knowingly and for the purpose of inducing the Plaintiffs to make the monthly note payments to Defendants.

157. Defendants and its agents acted with scienter, and intended that the Plaintiffs rely on the misrepresentations.

158. Defendants and its agents knew the representations to be false at the time they were made to the Plaintiffs.

159. Plaintiffs reasonably relied on these false representations made by Defendants and its agents to their detriment when making payments on the notes believing the payments were being made to or for the benefit of the owner of the notes. This occurred between their formation dates and when Plaintiffs ceased making payments. At that time, Plaintiffs realized from securitization publicity that Defendants and its agents probably are not in the chain of title for, and do not own, their notes.

160. Defendants and its agents collected payments resulting from the Plaintiffs' reasonable reliance despite knowing that they were not, and are not, and were not representing, the rightful owner in possession of the notes, and thus, were not, and are not, in fact entitled to collect such payments from the Plaintiffs.

161. The payments to be made by the Plaintiffs were demanded by Defendants and its agents under false pretense.

162. The Plaintiffs have been injured by their reasonable reliance because they made payments on the notes to Defendants, and its agents, which are not the owner in possession of the

notes, and do not represent the owner or possessor of such, and as a result, are not in fact entitled to collect payment for such notes.

163. In light of these actions by Defendants and its agents, the Plaintiffs are entitled to a refund of all payments made by them to Defendants and its agents after securitization of the notes, an amount to be determined by the Court, plus pre-judgment interest.

## COUNT VI

### Violations of State Consumer Protection Statutes

164. The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

165. Plaintiffs are "consumers" as defined in their respective state consumer protection statutes.

166. The activities of Defendants as alleged in the preceding causes of action constitute deceptive acts and practices in the conduct of Defendants' business and furnishing of services.

167. The Defendants committed loan modification fraud by misrepresenting a material fact to Plaintiffs by failing to state that their mortgages would be assigned or insured and bundled in such a way that there would be no bank having an interest in working with the Plaintiffs in the event they needed a forbearance or modification agreement despite Plaintiffs' qualifications. This is one of the primary obligations of the lending bank under law and industry-wide custom and usage, and part of Defendants' implied covenant of good faith and fair dealing with the Plaintiffs.

168. In addition to maintaining a fraudulent modification program, Defendants repeatedly acted in a predatory fashion when offering certain loans to Plaintiffs. Defendants hid the true costs of credit for the mortgages by failing to deliver the Federally-required disclosures

32

to Plaintiffs and misrepresenting numerous other critical and material aspects of financing transactions. In particular:

A. Defendants misrepresented that certain Plaintiffs could afford the monthly payments on an adjustable-rate loan, when the payments would drastically increase beyond Plaintiffs' means absent some unforeseeable drastic increase in their income, or provided incorrect information to Plaintiffs regarding the fixed interest rate loan terms.

B. Required insufficient financial documentation, or disregarded critical aspects of Plaintiffs' loan applications, to adequately determine a borrower's income and financial capability to make all payments through the life of a loan, when approving Plaintiffs for a mortgage.

C. Tolerated exaggerated incomes of certain Plaintiffs because Defendants' underwriting guidelines permitted it to lend more money, allowing Defendants to garner more interest than would otherwise have been possible.

D. Failed to disclose escrow charges for taxes and insurance from Plaintiffs' disclosed monthly mortgage payment to make the payment seem more affordable.

E. Offered mortgage loans that Plaintiffs could not afford to service, but were nonetheless made, because Defendants adequately collateralized such loans, which amounts to improper asset-based lending.

F. Falsely made assurances regarding not only the stability of the housing market, but grossly exaggerated expected growth in housing prices. This was done to induce Plaintiffs to accept loan terms because it was encouraged that

there would always be an option to sell their homes at a profit, or else refinance it with more favorable terms.

G. Failed to disclose how a negative-amortization loan works, in particular how the unpaid interest is added to the principal amount, causing it to drastically increase.

H. Failed to adequately disclose how an adjustable rate loan operates in that it has monthly payments that continue to rise over the life of the loan.

169. The activities as alleged are directed to hundreds of thousands of consumer-homeowners who have financed their homes through notes that have been securitized.

170. Defendants' acts and misrepresentations constitute acts, uses, or employment by Defendants and its agents of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment.

171. The unfair and deceptive trade acts and practices of Defendants have directly, foreseeably, and proximately caused damages and injury to Plaintiffs and consumers at large.

172. Plaintiffs relied to their detriment on the deceptive acts and practices, and have no adequate remedy of law.

173. Plaintiffs assert claims for violations of their respective specific state consumer protection laws against Defendants, its successors-in-interest, agents, servants, employees, or others with whom they acted in concert, have acted in some control or capacity over the origination, processing, and/or servicing of the Plaintiffs' loans.

174. Plaintiff Trout asserts claims under Arkansas Statutes §§ 4-88-107 and 4-88-113.

175.    Plaintiff Choiniere asserts claims under General Statutes of Connecticut §§ 42-110b and 42-110g.

176.    Plaintiff Verdejo asserts claims under Illinois Compiled Statutes §§ 815 ILCS 505/2 and 815 ILCS 505/10a.

177.    Plaintiffs Kelley, Brown and Haviland assert claims under Maryland Statutes §§ 13-301 and 13-408.

178.    Plaintiff Patten asserts claims under Minnesota Statutes §§ 325D.44 and 325D.45.

179.    Plaintiffs Nabedrik, Cervantes, Ashraf, Fountain, Fields, and McGriff assert claims under New York General Business Law § 349.

180.    Plaintiff Schwind asserts claims under North Carolina General Statutes §§ 75-1.1, 75-16, and 75-16.1.

181.    Plaintiffs Delaney, Brown, Drearry, and Greenzweig assert claims under Pennsylvania Statutes 73 P.S. §§ 201-2, 201-3, and 201-9.2.

182.    Plaintiff Bastian asserts claims under South Carolina Code of Laws §§ 39-5-20 and 39-5-140.

183.    Plaintiffs Chapman and Taylor assert claims under Revised Code of Washington §§ 19.86.020 and 19.86.090.

184.    Plaintiff Jones, Fogarty asserts claims under Wisconsin Statutes §§ 100.18(1) and 100.18(11)(b)(2).

185.    Under the afore-mentioned state statutes, the Plaintiffs are entitled to and request a preliminary and permanent injunction against Defendants to order it to stop these unlawful practices, and for an award of actual damages caused to the Plaintiffs, an amount to be determined by the Court, and the statutory relief provided by said laws upon a finding that

Defendants acted willfully and knowingly to violate these provisions of law.  Also, Plaintiffs are entitled to an award of attorney's fees and any other and further relief as this Court deems just and proper.

**COUNT VII**

**<u>Violations of the Federal Truth in Lending Act</u>**

186.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

187.    At the time of each of the transactions between the Defendants and individual Plaintiffs, Defendant lenders, and their successors-in-interest, acted as a creditor who regularly engaged in the making of mortgage loans, payable by agreement in more than four installments or for which the payment of a finance charge is or may be required whether in connection with loans, sales of property or services, or otherwise.  Accordingly, Defendants are subject to the Federal Truth-In-Lending Act (hereinafter "TILA"), 15 USC §§ 1601 et seq., and its implementing regulations, Federal Reserve Board Regulation Z (hereinafter "Regulation Z"), 12 CFR § 226.

188.    As a result of the subject transactions, Defendants acquired an interest in Plaintiffs' homes that secures payment or performance of an obligation.

189.    Upon information and belief, in the course of the subject consumer credit transactions described above, Defendants violated the disclosure requirements of TILA and Regulation Z regarding the mortgages given by Plaintiffs, by failing to disclose to Plaintiff material terms at the time of and leading up to closing of titles.

190.    Defendants failed to disclose properly and accurately the amount financed, in violation of 15 U.S.C. § 1638(a)(2) and 12 C.F.R. §§ 226.18(b) & 226.4.

191.    Defendants failed to disclose properly and accurately the finance charge fees payable to third parties that were not bona fide or reasonable in amount, as required by 15 U.S.C § 1638(a)(3) and 12 C.F.R. §§ 226.18(d) & 226.4;

192.    Defendants failed to disclose properly and accurately the "annual percentage rate" in violation of 15 U.S.C. § 1638(a)(4) and 12 C.F.R. § 226.18(e).

193.    Defendants failed to disclose properly and accurately the variable rate in violation of 15 U.S.C. § 1638(a)(14) and 12 C.F.R. § 226.18(f).

194.    Defendants failed to disclose properly and accurately the "total of payments" in violation of 15 U.S.C. § 1638(a)(5) and 12 C.F.R. § 226.18(h).

195.    Defendants failed to disclose properly and accurately the number, amount, and due dates or period or payments scheduled to repay the obligation in violation of U.S.C. § 1638(a)(6) and 12 C.F.R. § 226.18(g).

196.    Defendants failed to disclose that a security interest was taken in the subject properties in violation of U.S.C. § 1638(a)(9) and 12 C.F.R. § 226.18(m).

197.    As a direct and proximate result of Defendants' failure to disclose, Plaintiffs entered into mortgage agreements with binding terms to their detriment, which would not have been agreed upon but for the TILA violations committed by Defendants.

## COUNT VIII

## Unjust Enrichment

198.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

199.    Through their conduct described herein, Defendants were unjustly enriched at the expense of each of the Plaintiffs by taking their money under false pretenses in the form of trial modification payments.

200.    While the trial payments may at times have technically been credited against the remaining principal of Plaintiffs' loans, Defendants led the Plaintiffs to believe making the trial modification payments was a necessary step, and if completed meant Defendants would provide a permanent modification.  However, because of Defendants' dual-track process and flagrant shortcomings in their modification processing protocols, Plaintiffs' permanent modifications were destined to be rejected despite their compliance with the modification agreement.

201.    Defendants encouraged the furnishing of trial payments and were more than willing to accept the modification payments, yet were already anticipating breaching the permanent modification agreement for above-mentioned reasons.

202.    Defendants were merely trying to strip as much equity as possible from the Plaintiffs before trying to take their homes through an eventual foreclosure, despite Plaintiffs' completion of requirements pursuant to a modification contract.

203.    Plaintiffs would not have made these trial payments had they known Defendants was internally guiding them towards foreclosure, regardless of terms earlier agreed upon.

204.    The Defendants also owe the Plaintiffs a legal and equitable duty to account for the losses suffered by Plaintiffs due to Defendants' fraudulent collection of monthly mortgage payments under false pretenses and Defendants' failure to make restitution therefore.

205.    Furthermore, Defendants took final possession of some Plaintiffs' homes through foreclosure and severely and permanently deprived Plaintiffs of not only the equity remaining in

their homes but of their actual physical residence following their refusal to comply with the terms of their modification agreements.

206.    To permit the Defendants to retain their unjust gains would be against equity and good conscience, and would ratify the illegal actions taken by the Defendants to the detriment of the Plaintiffs.

207.    In order to avoid the unjust enrichment and equity stripping practices of the Defendants, it should be ordered to pay back to each Plaintiff any and all monies unjustly received from him or her.  Such damages, including months of surreptitiously accepted trial payments should be determined at trial.

## COUNT IX

## Fraud in the Inducement

208.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

209.    Defendants fraudulently induced Plaintiffs to enter into unduly burdensome mortgage loans by misrepresenting or withholding material information.  In particular:

A.    Defendants misrepresented that certain Plaintiffs could afford the monthly payments on an adjustable-rate loan, when the payments would drastically increase beyond Plaintiffs' means absent some unforeseeable drastic increase in their income, or provided incorrect information to Plaintiffs regarding the fixed interest rate loan terms.

B.    Required insufficient financial documentation, or disregarded critical aspects of Plaintiffs' loan applications, to adequately determine a borrower's income

and financial capability to make all payments through the life of a loan, when approving Plaintiffs for a mortgage.

C. Tolerated exaggerated incomes of certain Plaintiffs because Defendants' underwriting guidelines permitted it to lend more money, allowing Defendants to garner more interest than would otherwise have been possible.

D. Failed to disclose escrow charges for taxes and insurance from Plaintiffs' disclosed monthly mortgage payment to make the payment seem more affordable.

E. Offered mortgage loans that Plaintiffs could not afford to service, but were nonetheless made, because Defendants adequately collateralized such loans, which amounts to improper asset-based lending.

F. Falsely made assurances regarding not only the stability of the housing market, but grossly exaggerated expected growth in housing prices.  This was done to induce Plaintiffs to accept loan terms because it was encouraged that there would always be an option to sell their homes at a profit, or else refinance it with more favorable terms.

G. Failed to disclose how a negative-amortization loan works, in particular how the unpaid interest is added to the principal amount, causing it to drastically increase.

H. Failed to adequately disclose how an adjustable rate loan operates in that it has monthly payments that continue to rise over the life of the loan.

210.   Upon information and belief, each such representation was a false representation of material fact.

211.    These representations of material fact were made knowingly and for the purpose of inducing the Plaintiffs to make the monthly note payments to Defendants.

212.    Defendants and its servicers and agents acted with scienter, and intended that the Plaintiffs rely on the representations.

213.    Defendants and its agents and servicers knew the representations to be false at the time they were made to the Plaintiffs.

214.    Plaintiffs reasonably relied on these false representations made by Defendants and its agents and servicers to their detriment when accepting certain terms on their home mortgage loans.

215.    As a proximate result of Defendants' misrepresentations, Plaintiffs have suffered financial loss and severe mental anguish and emotional distress over facing the possible loss of their homes through foreclosure.

## COUNT X

## <u>Violations of the Real Estate Settlement Procedures Act</u>

216.    The allegations contained in each paragraph set forth above in this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

217.    The subject transactions described above is, at most, federally related mortgage loans as defined in 12 USC § 2602(1), and therefore, is subject to the Real Estate Settlement Procedures Act (hereinafter "RESPA"), 12 USC §§ 2601 et seq.

218.    RESPA prohibits any unearned fees, such that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed" pursuant to 12 USC § 2607(a).

41

219.    On information and belief, Defendants violated RESPA when engaging with Plaintiffs in that Defendants gave improper incentive kickbacks or premiums to loan officers and brokers in exchange for marketing and signing Plaintiffs to certain loans including those with adjustable rate terms, when they were not viable candidates, solely so Defendants could garner greater interest plaintiffs.  Home appraisals were also falsely inflated by real estate brokers, often as a result of additional RESPA violations committed by Defendants.

220.    Prior to Plaintiffs home purchase closings, Defendants did not provide all necessary disclosures including a clear itemization of all charges imposed upon the borrower pursuant to 12 USC § 2603 or the required explanation of material terms including payments, penalties, prepayments, charges, appraisals, and costs pursuant to 12 USC § 2604(b)(1)

221.    Furthermore, Defendants also acted in defiance of 12 USC § 2605(e) by taking no action concerning the inquiries submitted with Plaintiffs' Qualified Written Request.  Defendants did nothing to resolve Plaintiffs' complaints over a failure to disclose information prior to closing, predatory lending practices and other abuses including accounting and ownership issues of the note payments.

222.    Defendants also did not provide any of the information requested such that Plaintiffs' could conduct their own investigation into the matters.  In the absence of Defendants' failure to take action to address these issues, Defendants have also not provided an adequate explanation for its refusal to do so.

223.    As a proximate result of Defendants' violations, Plaintiffs have suffered financial loss and severe mental anguish and emotional distress over facing the possible loss of their homes through foreclosure.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs pray the Court for the following relief against Defendants:

A.  An order declaring that Defendants' alleged acts and practices constitute a breach of contract;

B.  An order for Defendants' specific performance of its contractual obligations together with other relief required by contract law;

C.  An order declaring that Defendants are required under the doctrine of promissory estoppel to honor the loan modifications with Plaintiffs on terms represented in their loan modification agreements or rules of equity with Defendants;

D.  An injunction enjoining Defendants permanently from collecting on Plaintiffs' notes, which are backed by mortgages held by Defendants;

E.  Restitution to Plaintiffs and actual damages for injuries suffered by Plaintiffs, equity removed for foreclosed properties, and payments not entitled to be received by Plaintiffs;

F.  Restitution to Plaintiffs for mental anguish and emotional distress suffered by Plaintiffs as a result of Defendants' fraudulent modification practice which exists to direct borrowers towards foreclosure and inducement of Plaintiffs to enter into less than desirable loans;

G.  Actual and statutory damages pursuant to the various state consumer protection statutes;

H.  Actual damages resulting from Defendants' TILA violations;

I.  Actual damages resulting from Defendants' RESPA violations and additional damages as the Court may allow in an amount not to exceed $2,000.00 per Plaintiff, for violations of 12 USC § 2605(e) and treble damages pursuant to 12 USC § 2607

J.      Reasonable attorney's fees and costs of this action, statutory pre-judgment interest, and such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands trial by jury to the extent authorized by law.

Dated:          April 12, 2013
                Brooklyn, New York
                                    _____
                                    Michael E. Herskowitz, Esq.
                                    Michael A. Lehrman, Esq.
                                    *Of Counsel to*
                                    THE HOFFMAN LAW GROUP, P.A.
                                    1999 Flatbush Avenue, Suite 201
                                    Brooklyn, New York 11234
                                    Tel: (718) 998-5088

                                    *Attorneys for the Plaintiffs*